204 N.J. Super. 445 (1985)
499 A.2d 251
J.W. FIELD COMPANY, INC. AND JACK W. FIELD, PLAINTIFFS,
v.
TOWNSHIP OF FRANKLIN, PLANNING BOARD OF TOWNSHIP OF FRANKLIN, FRANKLIN TOWNSHIP SEWERAGE AUTHORITY AND STONY BROOK REGIONAL SEWERAGE AUTHORITY, DEFENDANTS.
JZR ASSOCIATES, INC., PLAINTIFF,
v.
TOWNSHIP OF FRANKLIN ET ALS, DEFENDANTS.
FLAMA CONSTRUCTION CORPORATION, PLAINTIFF,
v.
TOWNSHIP OF FRANKLIN ET ALS, DEFENDANTS.
WOODBROOK DEVELOPMENT CORP., PLAINTIFF,
v.
TOWNSHIP OF FRANKLIN, ET ALS, DEFENDANTS.
WHITESTONE CONSTRUCTION, INC., PLAINTIFF,
v.
TOWNSHIP OF FRANKLIN ET ALS, DEFENDANTS.
BRENER ASSOCIATES, PLAINTIFF,
v.
TOWNSHIP OF FRANKLIN, ET ALS, DEFENDANTS.
RAKECO DEVELOPERS, INC., PLAINTIFF,
v.
TOWNSHIP OF FRANKLIN, ET ALS, DEFENDANTS.
JOHN H. VAN CLEEF, SR., JOHN E. VAN CLEEF, JR. AND BONNIE VAN CLEEF, PLAINTIFFS,
v.
TOWNSHIP OF FRANKLIN, ET ALS, DEFENDANTS.
LEO MINDEL, PLAINTIFF,
v.
TOWNSHIP OF FRANKLIN, ET ALS, DEFENDANTS.
R.A.S. LAND DEVELOPMENT COMPANY, INC., PLAINTIFF,
v.
TOWNSHIP OF FRANKLIN, ET ALS, DEFENDANTS.
JOPS COMPANY, PLAINTIFF,
v.
TOWNSHIP OF FRANKLIN, ET ALS, DEFENDANTS.
Superior Court of New Jersey, Mount Laurel II.
Decided January 3, 1985.
*449 David J. Frizell for plaintiffs J.W. Field Company, Inc., Jack W. Field, Woodbrook Development Corp. and R.A.S. Land Development Company, Inc. (Frizell & Pozycki, attorneys).
Francis P. Linnus for plaintiff JZR Associates, Inc. (Lanfrit & Linnus, attorneys).
Frederick C. Mezey for plaintiff Flama Construction Corporation, (Mezey & Mezey, attorneys).
Herbert J. Silver for plaintiff Whitestone Construction Corporation.
Guliet D. Hirsch for plaintiff Brener Associates (Brener, Wallack & Hill, attorneys).
Douglas K. Wolfson for plaintiff Rakeco Developers, Inc. (Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, attorneys).
Emil H. Philibosian for plaintiffs John J. Van Cleef, Sr., John E. Van Cleef, Jr. and Bonnie Van Cleef.
Stewart M. Hutt for plaintiff Leo Mindel (Hutt, Berkow, Hollander & Jankowski, attorneys).
Allen Russ for plaintiff Jops Company.
Thomas J. Cafferty for defendant Franklin Township (McGimpsey & Cafferty, attorneys).
Dennis A. Auciello for defendant Franklin Township Planning Board.
*450 SERPENTELLI, J.S.C.
This Mount Laurel case requires the court to establish the priority of builder's remedies among several plaintiffs whose offer to build low and moderate housing exceeds the fair share number of the municipality.
Eleven complaints seeking a builder's remedy were filed within a time span of approximately six months and eight of them were filed in the first three months of the litigation. Each plaintiff proposes that 20% of the units constructed will be affordable by low and moderate income persons pursuant to the guidelines established by our Supreme Court. Southern Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp., 92 N.J. 158, 279 n. 37 (1983) (hereinafter Mount Laurel II) (all page citations shall refer to Mount Laurel II unless otherwise noted) A builder who demonstrates that the municipal land use ordinances fail to comply with Mount Laurel II and who proposes a substantial lower income component is entitled to a builder's remedy unless the municipality establishes that the development will generate substantial negative environmental or planning results. (at 279-280) Assuming that several builders meet this threshold test for entitlement to a remedy, that it is appropriate to award more than one builder's remedy and that the total lower income units to be built will exceed the fair share of the town, the issue becomes: In what order of priority should the remedies be awarded?
This issue exists in several cases now before the court. It has been extensively briefed here and in other cases. In most instances each brief has supported the approach most likely to spell relief for the plaintiff submitting it. Priority schemes have stressed the importance of the date of filing of the complaint, the order of suitability of the sites, the feasibility of the projects, prior efforts at a negotiated settlement, prior zoning of the parcels, municipal planning preferences, whether the plaintiff is a landowner or speculator, the division of the fair share proportionately and even the establishment of a *451 complex rating system not unlike a beauty contest or gymnastic event. The swing is from total objectivity despite arbitrariness to total subjectivity despite uncertainty.
A perfect solution to the problem is probably unachievable. Furthermore, the adoption of any system of priorities will have to yield to adjustment in those cases where special circumstances or equities exist. Any workable solution for the typical case must balance competing policy considerations found in Mount Laurel II in a manner which will normally create a just result.
The principal policy considerations are:
1. The need to encourage builders to bring Mount Laurel actions.
2. As a corollary to number one, the need to maintain a bright line test by which a builder can gauge with reasonable certainty, in advance of suit, the likelihood of being awarded the remedy.
3. In contrast, the necessity to be sensitive to the environmental and zoning impact on the municipality resulting from the award of multiple builder's remedies.
4. As a corollary to number three, the avoidance of excessive litigation against the municipality and the maintenance of the greatest possible degree of latitude for the municipality in devising its response to its Mount Laurel obligation.
5. The express intention of our Supreme Court to channel development, insofar as possible, to growth areas and to preserve other areas for limited growth.
6. The desire to promote voluntary compliance and early settlement.
7. The need to restrict the award of a builder's remedy to those cases in which it is likely to result in actual construction of lower income housing.
Each of these seven overriding policy objectives must be reviewed separately and balanced in combination to devise the priority plan.

1. Encouraging builders' suits.

Our Court has expressly recognized that builder's remedies must be made readily available so that the municipalities will achieve compliance. (at 279) A builder's remedy will be granted "as a matter of course," where the builder demonstrates noncompliance of the ordinance, proposes to construct a substantial amount of lower income units and the *452 construction can be implemented without substantial negative environmental or planning impact. (at 279-280, 330)
The Court's intent to utilize builder's remedies liberally is further evidenced by the fact that the Court placed the burden of proof as to negative environmental or planning impact on the municipality rather than requiring the builder to prove site suitability. (at 279-280) Additionally, merely because a municipality prefers some other location or because it can prove that a better site is available does not support the denial of a remedy. (at 280)
The builder's remedy is the economic inducement held out to developers so that they will enforce the Mount Laurel obligation of our municipalities. It was the Court's goal to maintain a significant level of Mount Laurel litigation. (at 279) This incentive has produced the desired result. The experience of this court demonstrates that the level of Mount Laurel litigation has increased dramatically since Mount Laurel II and every suit has been brought by a builder rather than a nonprofit or public agency.

2. The need to maintain a bright line test.

Mount Laurel II recognized that, in the absence of bright line standards, "(c)onfusion, expense, and delay have been the primary enemies of constitutional compliance in this area." (at 292) Thus, in an effort to strengthen the Mount Laurel doctrine and provide certainty in its implementation, the Court adopted several bright line tests. The State Development Guide Plan (hereinafter SDGP) replaced the developing standard. (at 225) The centralized management by three judges replaced the county based management of cases. (at 253) The precise fair share number requirement replaced the numberless approach. (at 222) The good or bad faith of a municipality in attempting to comply is no longer relevant. Instead, its efforts are to be measured against the standard of whether its ordinances in fact provide a realistic opportunity *453 for construction of its regional fair share obligation. (at 220-221)
The bright line standards adopted by the Court were a means of ensuring effective implementation of the constitutional obligation. But certainty is no less important in the context of builder's remedies. A builder is less likely to sue if he cannot gauge, with reasonable certainty, the chances of being awarded a remedy. If the builder does not sue there is no opportunity to apply the bright line standards developed by the Court for implementation purposes and the net result may be continued noncompliance.

3. Environmental and zoning concerns.

The award of a builder's remedy is not a license for unchecked growth. The goal is to devise a solution which maximizes the opportunity for lower income people and minimizes the impact on the municipality. Our Supreme Court has emphasized that once an ordinance is found to be noncompliant the municipality should continue to control its own planning destiny, subject only to the rights that flow from a builder's remedy. Even if a remedy is granted, the proposed project will be closely scrutinized. (at 280)
The award of a builder's remedy itself takes into account its environmental or zoning suitability. The court must deny a builder's remedy if the municipality "establishes that because of environmental or other substantial planning concerns, the plaintiff's proposed project is clearly contrary to sound land use planning". (at 279-280) However, even if a remedy is granted, the Court has provided authority to soften the impact of construction by phasing-in development over a period of years to avoid a radical transformation. (at 280, 331-332)
The authority to phase is only part of our Court's overall awareness of the need to monitor the growth which will result from Mount Laurel development. (at 219, see also 211, 220, 311-312) The Court has stressed its concern for the protection *454 of the environment. (at 211, 219-220, 331, n. 68) Therefore, any system of prioritization of remedies must address that concern.

4. Avoidance of unnecessary litigation and maintenance of planning flexibility.

Recognizing that the municipal responsibility is to provide a realistic opportunity for housing and not litigation, at 199, there is a need to fashion a priority system that will discourage unnecessary litigation and preserve municipal planning flexibility. The Court's decision to expand builder's remedies was not intended to permit the use of the courts "as the enforcer for the builder's threat to bring Mount Laurel litigation" or "as a license for unnecessary litigation". (at 280-281)
This court's experience has demonstrated that it is very difficult to prove that a suit has been brought unnecessarily or as a leverage mechanism. Experience has also demonstrated, however, that there is a limit to the number of plaintiffs needed to vindicate the constitutional obligation and that excessive plaintiffs can emasculate the municipal planning options.
There is a benefit to have before the court more than one builder ready to build lower income housing. It is difficult for the court at the outset of the litigation to decide when enough is enough. Accordingly, it is not uncommon for a town to be sued by a half a dozen or more plaintiffs. When the suits are timely filed, fairness and efficiency require that the suits be consolidated so that all may participate in the determination of the fair share and ordinance compliance. In the case of late filings, a partial consolidation for purposes of participating in any court ordered ordinance revision is also frequently the most efficient and fair resolution.
The negative side of these consolidations is to lengthen the trials, make them more complex, dramatically increase the expense of defending the suit, expose the municipality to the potential award of numerous builder's remedies which will strip *455 it of its planning choices and make voluntary resolution unlikely. Add to that the additional burden on judicial time and the litigation can reach a level of complexity which our Supreme Court sought to avoid in streamlining Mount Laurel litigation. (at 200) While liberal consolidation may have its advantages, cf. at 255, little is gained by having more plaintiffs than are needed to actively pursue the litigation and achieve compliance. Therefore, as part of the prioritization of remedies, the court should strive to balance the need to encourage builder's remedies suits against the need to discourage excessive suits and maintain municipal planning flexibility.

5. Growth and limited growth areas.

Mount Laurel II is replete with language which emphasizes the Court's desire to channel growth into those areas classified in the SDGP as "growth" and to discourage development in those areas classified as "limited growth" or other designations. While adopting the SDGP for the purposes of providing a sure identification of the fair share obligation, the Court also expressly acknowledged that "(i)ts remedial use in Mount Laurel disputes will ensure that the imposition of fair share obligations will coincide with the State's regional planning goals and objectives." (at 225) Again, the Court said:
Channeling the development impetus of the Mount Laurel doctrine into `growth areas' is precisely the kind of use of the plan that was intended by those who prepared it. (at 227.)
See also Mount Laurel II at 233, 244, 329, 351
The SDGP should not, as a matter of law, be a determinant of the right to a builder's remedy. Orgo Farms & Greenhouses, Inc. v. Colts Neck Tp., 192 N.J. Super. 599 (Law Div. 1983) However, in light of the planning function ascribed to it by the Court, it must be a factor in determining the priority among those seeking a builder's remedy.

6. Voluntary Compliance and Early Settlement.

At the outset of Mount Laurel II, the Court articulated the several purposes of its rulings. The first stated purpose *456 was the encouragement of voluntary compliance with the constitutional obligation. 92 N.J. at 214 Since Mount Laurel II was decided some municipalities have been sued before compliance efforts were undertaken or completed. In that setting the same principles which support voluntary compliance also call for early settlement. As stated above, it is in the municipality's interest to avoid builder suits so that it may reserve to itself complete planning flexibility in its Mount Laurel response. If it is sued, the sooner the matter is resolved the less exposure the town has to multiple actions which will limit its zoning options. That is why this court has allowed any municipality a 90-day immunity from builder's remedy actions if the municipality will stipulate noncompliance and obtain the court's approval of a proposed fair share number. That procedure can be invoked either after the municipality has been sued or by way of a type of declaratory relief in the absence of suit.
There was a time when voluntary compliance was a difficult matter because of the uncertainty surrounding the constitutional obligation. (at 253) Since Mount Laurel II that uncertainty has been sharply reduced by the opinion itself, the intensive efforts of the planning community and the rulings of the trial courts. Most of the reasonable methodologies, to date, have produced fair share numbers within a relatively close range. Furthermore, in this court, a specific fair share methodology has been adopted subject to possible future revision as experience might dictate. Whatever revisions might occur, the current methodology is adequate to permit realistic assessment of the municipality's obligation. AMG Realty Company et al. v. Warren Tp., ___ N.J. Super. ___ (Law Div. 1984) (hereinafter AMG)
In addition to the court's willingness to grant a temporary immunity from builder's remedy relief pending ordinance revision, this court has also made it known that it will not insist on rigid adherence to the fair share methodology adopted in AMG when faced with efforts by municipalities to voluntarily comply. It could be argued that any deviation from a fair share methodology *457 which this court believes is the best yet produced, has the effect of ignoring a portion of the need that the methodology identifies. While I reiterate my confidence in the fundamental soundness of the AMG approach, I must also recognize that unbending adherence to that methodology particularly in a voluntary compliance setting would be ill-advised. In the first place, as noted in AMG, the adoption of the methodology espoused there was the start of an evolutionary process. Id. at ___ Perfection in fair share allocation has not been attained and until we near that goal, the numbers generated by any methodology cannot be treated as being scientifically precise. While I believe the fair share numbers represent an accurate estimate of the need, it would be arrogant to suggest that there is no margin of error in either direction. Second, if the court cannot allow some leeway in the numbers, there is little incentive for the municipality to settle. If the methodology is perceived as "the worst we can do"  whether that perception is justified or not  the municipality has little to lose and perhaps something to gain by continuing to fight. Yet, litigation does not produce housing. (at 199)
I hasten to add that the views I have expressed here should not be taken as a reversal of the thoughts expressed in AMG concerning the "numbers game". AMG, ___ N.J. Super. at ___ The arguments that the numbers are too high or low is not fruitful. To a large extent, the economy, private enterprise and other branches of government will determine whether the need is satisfied. Yet that issue is wholly unrelated to the validity of the methodology for, to date, nothing has been elicited to demonstrate that the AMG methodology is substantially flawed nor has a more satisfactory alternative been proposed. However, another consensus is evolving that even if everyone cooperates in making Mount Laurel work, the total need that exists in the 1990 projection period may have to be phased-in beyond that date. Though the need is real, the task is simply too large to be accomplished in full in that time span. To the extent that by protracted litigation we delay the day when we build what can be *458 built within the projection period, even less of the need will be met.
Thus, to those municipalities which are willing to do voluntarily what they are realistically capable of achieving, the court has established at least three benefits emanating from voluntary compliance-fair share flexibility, a temporary immunity against builder's remedy suits while the municipality revises its ordinances and the potential for phasing beyond the 1990 projection period.
Most municipalities which have been heard to complain about their Mount Laurel obligation insist that it is not the principle to which they object but rather the method of its implementation. The three devices discussed above are designed to help the municipalities deal with the practicality of implementing their fair share both in terms of providing the greatest latitude in planning their response to their constitutional obligation and minimizing its impact on their towns. The use of these and other reasonable approaches could remove or substantially ameliorate the most frequently voiced objection to Mount Laurel compliance-the overbuilding which allegedly results from satisfaction of the responsibility through the 20% mandatory set-aside. A municipality need not satisfy its responsibility by zoning for the construction of four marketplace units for every one lower price unit to be built. Many other avenues are available.[1]
*459 Alternative modes of compliance are lost if the municipality waits until it puts itself in the position that the fair share must be fulfilled through builder's remedies. A municipality can avoid becoming involved in prioritization of builder's remedies. Its choice is to seize the initiative through voluntary compliance, early settlement and compliance mechanisms such as phasing or wait to be sued and possibly subject itself to a court imposed priority arrangement. The enunciation of the prioritization plan should amply clarify which option is preferable and the prospect of being bound by a prioritization schedule should itself promote voluntary compliance and early settlement.

7. Actual Construction.

The Mount Laurel II opinion is replete with language which stresses that both the compliance order and any builder's remedy should result in actual construction.
Where builder's remedies are awarded, the remedy should be carefully conditioned to assure that in fact the plaintiff-developer constructs a substantial amount of lower income housing. (92 N.J. at 281, Court's emphasis)
Again, at the very close of its opinion the Court reiterates:
We have required municipalities to take affirmative action to comply with Mount Laurel and refocused the litigation on the question of whether low and moderate income housing will be built. (at 352, emphasis added)
See also Mount Laurel II at 222, 261, 280, 330
The highlighting of actual construction argues strongly for the desirability of having more than one plaintiff involved in the proceeding. The mere revision of zoning ordinances to comply with Mount Laurel does not ensure actual construction. In fact, even the designation of apparently suitable sites in the ordinance does not mean that they will be made available to the Mount Laurel marketplace. Such intangibles as the individual predilections of the owners, possible political pressures on them not to sell, the inflation of market prices because of the zoning and other factors, create an uncertain future even assuming that all involved in the rezoning process have done their best to remove these vagaries. Cf. at 261, n. 26 The presence of more than one plaintiff before the court lessens that uncertainty *460 and gives greater assurance that Mount Laurel construction will occur. Since the court has the authority to condition the award of a builder's remedy on actual construction taking place, a builder who is not willing to build is unlikely to sue. One who does sue and does not build in accordance with that condition will lose the remedy.
Having identified the most pertinent policy considerations involved in prioritization, I have concluded that the following system of priorities should be created.

Step One. A builder must have met the threshold test of entitlement to a remedy in order to participate in the prioritization scheme. Since an element of the threshold test is success in proving noncompliance, a plaintiff who does not participate in that aspect of the trial shall not be entitled to a builder's remedy. Thus a plaintiff partially consolidated for ordinance revision purposes only should not take part in the prioritization plan.

Step Two. The first builder who files a complaint and establishes entitlement shall receive the first remedy but only if the property is located significantly within the growth area.

Step Three. Thereafter, remedies shall be awarded to builders establishing entitlement based on the date of filing as to any property located significantly within the growth area, subject to the order being modified upon consideration of the following two criteria:
a. Is any project clearly more likely to result in actual construction than other projects?
b. Is any project clearly more suitable from a planning viewpoint than others?

Step Four. If a need for additional remedies to satisfy the fair share remains, parcels in the limited growth area which have passed the threshold test of entitlement shall be considered in the same manner as step three above.
A brief explanation of the prioritization plan and the court's reasons for this system follows.

Step One.
The first step-entitlement-is mandated by Mount Laurel II. (at 279-280) A builder must meet the threshold or three-pronged test discussed earlier to become entitled to a remedy. Cf. Orgo Farms & Greenhouses, Inc. v. Colts Neck Tp., supra, 192 N.J. Super. at 603 One element of the three-pronged test is that the builder must succeed in Mount Laurel litigation by demonstrating the noncompliance of the ordinance. 92 N.J. at *461 279 It follows that a plaintiff joined only for the purpose of participating in any court ordered revision does not take part in the portion of the trial in which noncompliance is demonstrated. Therefore, that plaintiff is lacking an essential element of entitlement.

Step Two.
Step two embodies the desire to encourage Mount Laurel suits to achieve ordinance compliance, to channel the suits to the growth areas and to reward the first plaintiff for initiating and shouldering the burden of Mount Laurel litigation. Cf. at 327; Orgo Farms & Greenhouses, Inc. v. Colts Neck Tp., supra, 192 N.J. Super. at 605-606 If the property of the first builder to sue is not significantly located in a growth area or that plaintiff cannot meet the entitlement test any subsequent plaintiff with property significantly within the growth area shall not be entitled to the benefits of step two priority. Step two can only reward the first plaintiff since that plaintiff has started the litigation. Any subsequent plaintiff, by definition, arrived at the scene after the suit has been brought.
Note that the benefit given to the first builder to file is not intended to dilute the Court's admonitions that plaintiff must act in good faith and attempt to obtain relief without litigation. (at 218) Thus, any builder who would otherwise be granted a remedy still stands to lose it if the Court's warnings are ignored. These issues will ordinarily be resolved at the same time the threshold determination of entitlement is made.
Admittedly, there may be instances when good faith negotiations will be futile. The plaintiff choosing to win the race to the courthouse by relying upon the futility defense had better be prepared to prove it or risk having won the race only to be disqualified for a false start.

Step Three.
The third step in prioritization involves the award of a remedy based on the date of the filing of the complaint as to properties located significantly within the growth area. It *462 allows for modification of the order of priorities upon evaluation of the issues of actual construction and planning compatibility. All other things being relatively equal, there is a benefit from the standpoint of certainty or bright lining to continue prioritizing by use of the filing date. However, there may be cases in which reasonable people  particularly reasonable planners and judges  could not disagree that one site is clearly preferable to another from the standpoint of actual construction or planning. In such instances, Mount Laurel II provides ample justification to adjust the order of priorities in light of these critical considerations.
The first basis for modification  actual construction, stresses the Supreme Court's concern that Mount Laurel litigation lead to housing. Perhaps the principal reason that a Mount Laurel II was necessary is that Mount Laurel I did not "result in housing, but in paper, process, witnesses, trials and appeals." (at 199) The opinion continually emphasizes that unless actual construction is achieved, nothing has been accomplished. Actual construction is "the core of the Mount Laurel doctrine." (at 205)
The builder's remedy was viewed by the Court as the most likely means of ensuring construction. (at 279) Therefore, it cannot be granted in a vacuum. The trial court must make every effort to assure that the plaintiff builds a substantial amount of lower income housing. (at 281) Of course, it will often be extremely difficult to determine whether one site is more likely to result in actual construction than another. For this reason, it must be reemphasized that modification of priorities based on the potential for construction can only occur if reasonable persons could not disagree that the order should be adjusted.
The second basis for modification of the prioritization by date of filing  planning considerations, is highlighted by the Court's repeated concern for the environmental and planning impact of *463 Mount Laurel. After noting that "unplanned growth has a price," at 236, our Supreme Court stated:
The Constitution of the State of New Jersey does not require bad planning.... There is nothing in our Constitution that says that we cannot satisfy our constitutional obligation to provide lower income housing and, at the same time, plan the future of the state intelligently. (at 238)
In fact, the Court's endorsement of the SDGP represents, in part, an effort to harmonize the conflicting goals of housing growth and preservation of our resources. Therefore, while acknowledging that some change must result if the constitutional rights of lower income citizens are to be protected, the Court sought to confine the growth within specific areas and at the same time shield other areas from uncontrolled development. (at 220, 233, 247) Furthermore, the Court granted the trial judge the power to deal with any possible negative environmental or planning results occasioned by the grant of a remedy. (at 279-280)
The Supreme Court's adoption of the SDGP for planning purposes and its authorization of the phasing concept are just two examples of the attention paid to environmental and planning considerations throughout the opinion. Cf. Mount Laurel II at 211, 219, 220, 311-312, 331, n. 68 It is therefore appropriate that those concerns be confronted not only in the entitlement stage of the builder's remedy as one element of the three-pronged test but also in those instances in which it becomes necessary to prioritize remedies. What factors should be utilized to evaluate site suitability are best left at this time to the input of the planning community. Criteria which have already been suggested include availability of infrastructure, proximity to goods and services, regional accessibility, environmental suitability and compatibility with neighboring land uses. To the extent that a well conceived and reasonable master plan incorporates such criteria, it may be of some value to the master. The master plan will also presumably reflect municipal site preferences. While those preferences alone cannot defeat an entitlement to a builder's remedy, at 280, they can be considered in the prioritization process as part of the evaluation *464 of site suitability. Thus, the site suitability analysis for prioritization purposes will differ from the site suitability analysis for entitlement purposes. At the entitlement stage the examination will focus on the legal criteria established by the Court to warrant the award or denial of a remedy. The right to a remedy will not turn on municipal site preferences. At the prioritization stage entitlement has already been established. The focus then is on the planning issues of comparable suitability. The examination may involve the criteria suggested above including the policies reflected in a sound master plan.
Again, it must be repeated that since there are frequently subjective evaluations inherent in planning judgments, in order to warrant modification of the step three order of remedy it must be found that there cannot be a reasonable disagreement concerning the preferred suitability from a planning standpoint of one site over another. Absent such a standard, any certainty or bright lining would be eliminated after the first to sue receives the remedy and the debate could rage on endlessly.
Finally, there may be situations in which a site may have excellent potential for actual construction which will, however, create very negative environmental or planning problems. Both factors must be weighed in concert. Neither factor is to outweigh the other in the prioritization plan if a modification of the order based on filing date is sought. Both must be evaluated and only if the facts clearly justify preference to a particular site or sites  utilizing the reasonable person test as described above  may the prioritization order be altered.

Step Four.
This court's experience demonstrates that there will be few prioritization cases in which the fair share cannot be satisfied by the award of a remedy to parcels located significantly within the growth area. Consequently, step four will not often be reached. If it is reached, a limited growth parcel can only be considered if it has passed the threshold test of entitlement. As I have previously noted, it may prove to be a rare *465 instance in which a remedy is granted in a limited growth area. Orgo Farms & Greenhouses, Inc. v. Colts Neck Tp., supra, 192 N.J. Super. at 611 Environmental or planning constraints, which must weigh heavier in a limited growth area, may block satisfaction of the third prong of the threshold test thereby precluding entitlement.
It is possible that a limited growth parcel could measure up to the three-pronged test. For example, limited growth property located in close proximity to a growth area which is surrounded by development in the limited growth area might be an appropriate in-fill site. Its utilization might do little or no violence either to local environmental or planning concerns or the growth management strategy of the SDGP. SDGP at 26-27 Given the recognition that the SDGP concepts are "broad, generalized areas without site-specific detail or precise boundaries," SDGP at ii-iii, and given the local decision to permit development within the limited growth area, a builder's remedy might be warranted. This constitutes no modification of the policies articulated in the SDGP, by the Supreme Court or by this court that, insofar as possible, development should be steered to the growth area. Rather it constitutes a recognition that, in special circumstances, the mere boundary line as shown on the concept maps may not be sufficient justification to warrant a denial of the remedy.
If the fourth step is reached and there is more than one parcel in limited growth entitled to a remedy, priority among them will be determined in the same manner as step three. That is, date of filing of the complaint shall prevail unless evaluation of actual construction or planning considerations support modification of the order of priority.
Several other issues relating to the priority schedule require brief attention. First, since significance is placed on the filing date and because certainty in that respect is essential, the date and time of filing to be considered shall be the date and time of filing with the office of the Superior Court Clerk in Trenton.
*466 Second, as alluded to at the outset of the opinion, the priority arrangement adopted here assumes that no municipality shall be called upon to absorb more than the fair share emanating from the methodology the Court utilizes. One plaintiff in these proceedings has suggested that the court award a remedy to all builders who have established entitlement  even if the fair share will be exceeded. That plaintiff hypothesizes that, in reality, all the builders who possess the remedy will not implement it either because they will decide not to proceed or because the market will not absorb the construction. If the construction of lower income units begins to approach the fair share number, the trial court could at that time make necessary adjustments. While the argument may have some merit in minimizing present uncertainties, it also creates several serious problems. It could place the court in the position of "revoking" builder's remedies when the fair share is achieved. It could also cause the determination of which sites are built to turn purely on economic factors without concern for planning considerations. By the time the court might be required to make necessary adjustments, irreparable harm may have already occurred. Additionally, the necessity of having to review the progress of builder's remedies will inevitably involve the court and all the parties in more litigation in contravention of the principles of repose designed by our Court. (at 291-292) Finally, the Supreme Court acknowledged that while municipalities may have to make adjustments to accommodate lower income housing, the Court also emphasized that they are not being "required to provide more than their fair share." (at 219, emphasis added) There is not even the slightest suggestion that the term "fair share" should take on a different meaning in order to satisfy all the plaintiffs' demands. Admittedly there was a time when a builder might be heard to complain that there is no way of knowing when the remedy he sought would exceed the fair share. Now a builder contemplating filing a complaint in this court should be able to make a reasonable estimate of a town's fair share based on the methodology heretofore adopted *467 by this court. AMG, supra He should also be able to assess, with some degree of certainty, the likelihood of obtaining a remedy based upon the priority scheme established in this opinion.
A third issue meriting discussion is the assumption made at the outset of this opinion that each builder's remedy must include a minimum of a 20% lower income housing component. Some plaintiffs have suggested that the priority puzzle can be solved by spreading the fair share among all plaintiffs at a lower set-aside percentage. One element of the three-prong test of entitlement established in Mount Laurel is that at least 20% of the builder's project must be devoted to lower income housing. (at 279, n. 37) This requirement has numerous justifications. To allow a nominal contribution will decrease the ability to satisfy the large need, will require more construction to satisfy that need, could magnify the impact of the construction on our municipalities and could encourage an unwanted number of suits. The builder's remedy is not a bonus granted without consideration. The quid pro quo is a substantial contribution to the lower income housing stock. I do not mean to suggest here that there is anything magical about the figure of 20%. The experience to date is that the minimum established by the Supreme Court has become the maximum offered by the builders. Whether requiring a higher percentage is feasible, as long as internal subsidies must be used to produce lower income housing, is yet to be decided. Cf. AMG, supra, ___ N.J. Super. at ___ That a substantial percentage must be produced is now beyond argument and 20% presently seems to be a reasonable minimum.
A fourth issue is created by the suggestion that the court need not become involved with prioritization and should instead only award one remedy. The problems emanating from that approach require me to reject the appealing simplicity of the solution. As noted earlier, there is an advantage to having several plaintiffs before the court. Since the goal of Mount *468 Laurel is actual construction, several plaintiffs tend to make achieving that goal more realistic. This fact alone justifies including a reasonable number of plaintiffs in the litigation. Furthermore, if only one plaintiff sues because the remedy is limited, that plaintiff may choose to settle the litigation, or perhaps because of the financial burden choose not to pursue it. The result could be continued noncompliance. If there are other plaintiffs still in the case the burden of the litigation can be shared, the case will continue despite an individual settlement or dismissal, and compliance can be attained.
There is a fine balance to be struck between this court's desire to preserve municipal planning flexibility and at the same time to encourage more than one plaintiff to bring suit so that compliance will be attained and housing will be built. If a municipality chooses not to voluntarily comply, it brings upon itself the potential that multiple builders will force it to comply. The choice is the municipality's. It has the power to control the number of plaintiffs that it must deal with through the procedures suggested earlier in this opinion. Without the exposure to multiple builder's remedies, however, the municipality has little incentive to take advantage of these mechanisms. Thus the prospect of multiple builder's remedies will tend to encourage voluntary compliance.
Any plan of priorities is bound, in some circumstances, to produce unhappy suitors. It is in the nature of the predicament that the municipal interests conflict with plaintiffs', plaintiffs' interests conflict with each other and the overriding policy issues pull in different directions. My goal in designing the four-step plan is to minimize the areas of conflict while at the same time to address even-handedly the legitimate needs of the parties and the public. The plan created here should continue to encourage necessary Mount Laurel suits, put a rein on unnecessary actions, provide for predictability from plaintiff's standpoint, protect our municipalities against unfettered growth and preserve, to the greatest possible degree, their local control over the growth which will occur.
NOTES
[1] The literature concerning alternative methods of compliance is starting to develop. The Court has received two documents about to be published which are cited here for informational purposes only. Alan Mallach, "Meeting Lower Income Housing Needs in the 1980's: The Economics of Housing New Jersey's Mount Laurel Population." Prepared for Mercer-Somerset-Middlesex Regional Study Council. (Specific publication information not available.); Robert A. Williams, "On the Inclination of Developers to Help the Poor: Designing Affirmative Measures to Induce the Construction of Lower Income Housing After Mount Laurel II." (To be published by Lincoln Institute of Land Policy, Cambridge, Mass.)