153 A.3d 981

IN THE MATTER OF THE APPLICATION OF THE TOWNSHIP OF SOUTH BRUNSWICK FOR A JUDGMENT OF COMPLIANCE AND REPOSE AND TEMPORARY IMMUNITY FROM MOUNT LAUREL LAWSUITS

Superior Court of New Jersey
Law Division
Middlesex County

Decided: July 21, 2016

442

*Donald J. Sears* and *Benjamin Bucca* for the Township of South Brunswick (*Donald J. Sears*, attorney).

*Kevin D. Walsh* and *Adam Gordon* for Intervenor Fair Share Housing Center, Inc.

*Kenneth D. McPherson, Jr.* for Intervenor South Brunswick Center, LLC (*Waters, McPherson, McNeill, PC*, attorneys).

*Robert A. Kasuba* for Intervenor Avalon Bay Communities, Inc. (*Bisgaier Hoff*, attorneys).

*Henry L. Kent–Smith* and *Irina B. Elgart* for Intervenor Richardson Fresh Ponds, LLC and Princeton Orchard Associates, LLC (*Fox Rothschild LLP*, attorneys).

## OPINION

WOLFSON, J.S.C.

## I. INTRODUCTION

### A. The Procedural Posture

Following the decision of the New Jersey Supreme Court in *In re Adoption of N.J.A.C. 5:96 & 5:97 by the N.J. Council on Affordable Housing*, 221 *N.J.* 1, 110 *A.*3d 31 (2015), (hereinafter "*Mount Laurel IV*"), the adjudication of a municipality's obligation to create, through its land use regulations, a realistic opportunity for producing its fair share of the region's need for affordable housing, was removed from the Council on Affordable Housing

("COAH") and returned to the Judiciary. Accordingly, each of the designated *Mount Laurel* trial judges was tasked with determining in a given case, whether the particular municipality's housing element and fair share plan complied with the requirements of *Mount Laurel.*[1]

Recognizing that some municipalities had embraced the prior COAH processes in good faith, but were stymied by that agency's inability to function, the Supreme Court set forth procedures by which municipalities that either received substantive certification from COAH, or had filed resolutions of participation prior to the judicial invalidation of COAH's third round methodology, could seek a judicial declaration that their respective land use regulations satisfied the constitutional imperative. In so doing, the Court afforded those towns a reasonable opportunity to demonstrate constitutional compliance without the specter of a "builder's remedy" action hanging over them like a "sword of Damocles." *See e.g., Mount Laurel IV, supra,* 221 *N.J.* at 3, 5–6, 23–24, 110 *A.*3d 31.

The clear intent of the Supreme Court was to develop a process that tracked, insofar as practical, the Fair Housing Act, *N.J.S.A.* 52:27D–301(2) to –329, ("FHA" or the "Act"), so as to "facilitate a return to a system of coordinated administrative and court actions," but it added a cautionary note that it did not intend the courts to become a "replacement agency for COAH." *Mount Laurel IV, supra,* 221 *N.J.* at 29, 110 *A.*3d 31. Instead, the Court identified specific guidelines, summarized below, which it gleaned from judicially approved COAH practices, to assist the various *Mount Laurel* judges in their tasks:

(1) Previous methodologies employed in the First and Second Round Rules should be used to establish present and prospective statewide and reasonable affordable housing need. The parties

---

[1] *See S. Burlington Cty. N.A.A.C.P. v. Twp. of Mount Laurel,* 67 *N.J.* 151 (1975) (hereinafter *"Mount Laurel I"*); *S. Burlington Cty. NAACP v. Twp. of Mount Laurel,* 92 *N.J.* 158, 456 A.2d 390 (1983) (hereinafter *"Mount Laurel II"*); *see also Hills Dev. Co. v. Bernards,* 103 *N.J.* 1, 510 A.2d 621 (1986) (hereinafter *"Mount Laurel III"*).

should demonstrate to the court computations of housing need and municipal obligations based on those methodologies.

(2) Many aspects of the two earlier versions of Third Round Rules were found valid by the appellate courts. In upholding those rules, those courts highlighted COAH's discretion in the rule-making process. Judges may "confidently use" similar discretion when assessing a town's plan, if persuaded that the techniques proposed by a town would promote for that municipality and region, the constitutional goal of creating a realistic opportunity for producing its fair share of the present and prospective need for low- and moderate-income housing.

(3) Prior round (pre–2015) obligations were preserved and are not to be ignored or eradicated. As such, municipalities must fulfill those obligations, and that prior unmet need is to be used as the starting point for the court's determination of a municipality's fair share responsibility. *Mount Laurel IV, supra,* 221 *N.J.* at 30, 110 *A.*3d 31; *see also In re Adoption of Hous. Element,* 444 *N.J.Super.* 163, 173, 131 *A.*3d 961 (Law Div. 2015) (hereinafter "*In re Monroe*") (any interpretation of FHA and COAH regulations that ignores the prior round unmet need would be contrary to the Constitution and the Legislature's overarching intent to produce affordable housing).

(4) A list of "approved actions," drawn from earlier Appellate Division decisions, may be "confidently" used and relied upon by the designated *Mount Laurel* judges in adjudicating the constitutionality of a town's housing element and fair share plan.

(5) "[F]lexibility" should be used, as needed, to "secure, whenever possible prompt voluntary compliance from municipalities," but judges should "avoid sanctioning any expressly disapproved practices from COAH's invalidated Third Round Rules." *Mount Laurel IV, supra,* 221 *N.J.* at 33, 110 *A.*3d 31.

In response to the Supreme Court's invitation in *Mount Laurel IV,* the Township of South Brunswick (the "Township" or "South Brunswick") filed this declaratory action on July 1, 2015, seeking

an affirmative declaration that its housing element and fair share plan created a realistic opportunity for producing its fair share of the region's need for low- and moderate-income affordable housing.

### B. The Novel Issues to be Adjudicated

This case required me to resolve three separate issues of first impression.

The first of these addresses the manner of conduct and/or circumstances under which a municipality's initial grant of immunity from builder remedy lawsuits, as authorized in *Mount Laurel IV*, can be revoked, along with the procedures to be utilized by a trial court in ascertaining whether to do so. For the reasons detailed below, I concluded that South Brunswick was "determined to be non-compliant," thereby resulting in the loss of its immunity, and consequently subjecting it to multiple builder remedy lawsuits.

The second issue is, in light of COAH's inability to function, how to craft an acceptable methodology—one that fosters and guarantees municipal compliance with, and implementation of, its constitutional fair share obligation—an exercise undertaken only once before, in 1984 by Judge Serpentelli. *See AMG Realty Co. v. Twp. of Warren*, 207 *N.J.Super.* 388, 504 *A.2d* 692 (Law Div. 1984).

While Judge Serpentelli's task was limited to assessing whether a "consensus" methodology that had been negotiated between and agreed to by the parties passed constitutional muster, in this case, no such "consensus" was presented. Instead, South Brunswick's declaratory judgment action pitted the opinions of municipal experts against those of the affordable housing advocates, which, consequently, compel me to adjudicate for the first time post-*Mount Laurel IV*, whether and to what extent the parties adhered to the Supreme Court's guidelines. In doing so I fashioned a methodology that I believe faithfully adheres to the Supreme Court's directives, and is consistent with the New Jersey Constitution.

Third, in light of my resolution of these two issues, I was also required to confront and decide, for the first time in over 30 years, when and how multiple builders' remedies can or should be awarded, as well as how they should be prioritized following the Supreme Court's expanded view of that remedy. *See Mount Laurel IV, supra,* 221 *N.J.* at 1, 110 *A.*3d 31. As discussed *infra,* I determined that an award of multiple builders' remedies was appropriate in this case and that they will <u>not</u> be subject to the "first to file" protocol originally outlined over 30 years ago by Judge Serpentelli in *J.W. Field Co., Inc. v. Franklin Twp.,* 204 *N.J.Super.* 445, 460–462, 499 *A.*2d 251 (Law Div. 1985), but rather, they will be based on various equitable considerations, consistent with environmental safeguards and sound land use planning.

## II. SOUTH BRUNSWICK'S GRANT OF TEMPORARY IM-MUNITY AND ITS REVOCATION

■ At the outset, I was tasked with determining whether South Brunswick, as a "participating" municipality, was entitled to interim immunity from exclusionary zoning/builders' remedy actions while its land use regulations were being evaluated by the court. *See Mount Laurel IV, supra,* 221 *N.J.* at 27–28, 110 *A.*3d 31. In determining whether to grant immunity, I was directed to "evaluate the extent of the obligation and the steps, if any, taken toward compliance with that obligation," including such relevant factors as "whether a housing element has been adopted, any activity that has occurred in the town affecting need, and progress in satisfying past obligations." *Id.* at 28, 110 *A.*3d 31

Based upon my preliminary review of the parties' written submissions, as well as a positive recommendation from Special Master Christine Cofone, I determined that South Brunswick had demonstrated sufficient good faith in satisfying its constitutional obligations to justify awarding it an initial five-month period of immunity, during which time it was to continue its efforts to prepare and adopt a constitutionally compliant housing element and fair share plan.

Approximately three months later, in October 2015, South Brunswick was ordered to submit a "Summary of Plan for Total Fair Share Obligation," requiring the Township to complete a prepared form which identified and calculated: (1) the Township's remaining rehabilitation share (if any); (2) its prior round obligation (or, surplus); and (3) its Third Round obligation. The Township complied. Accordingly, I extended its immunity for another month, enabling it to continue crafting a constitutionally compliant fair share plan.

When the Township returned to court the following month, it presented a revised iteration of the Township's fair share plan for review and discussion. Although "slight" incremental improvements had been made from its initial submission, the "revised" plan, contrary to the Special Master's direction, still included too many 100% affordable housing projects, proposed virtually no new inclusionary developments, and included too many "senior" units. Accordingly, I instructed the Township to address these deficiencies, and to facilitate it in doing so, I extended its immunity for an additional six weeks, until January 13, 2016, the date of the next case management conference.

At that court appearance, the Township's plan showed little or no improvement. Many of the plan's component parts were unrealistic or impractical. Still others were contrary to valid COAH regulations and/or judicial precedent. Nonetheless, over the objections of the intervenors, I extended, once again, the Township's immunity another five weeks to February 19, 2016. In doing so however, I directed the Township to "show cause" on that date why I should not conclude that the Township was "determined to be non-compliant." *See Mount Laurel IV, supra,* 221 *N.J.* at 33, 110 *A.*3d 31 (where "prompt voluntary compliance" cannot be accomplished with good faith effort and reasonable speed, the court may conclude that the town is "determined to be non-compliant" and revoke its immunity); *and see id.* at 26, 110 *A.*3d 31 (designated *Mount Laurel* judges entrusted "to assiduously assess whether immunity, once granted, should be withdrawn if a

particular town abuses the process"); *see also id.* at 33, 35–36, 110 *A.*3d 31.

On the return date of the order to show cause, the Township's plan was still inconsistent with COAH regulations and judicial precedents, and did not address even its own estimated fair share number. For example, it continued to include multiple 100% affordable housing projects, despite the limited availability of tax credits available through HUD's Low–Income Housing Tax Credit program. And, despite an oversupply of senior citizen housing in New Jersey generally, *see N.J.S.A.* 45:22A–46.3(e), (h) (age-restricted housing market is oversupplied), the plan included excessive age-restricted units, contrary to the 25% limitation embodied in *N.J.A.C.* 5:93–5.14.[2]

Similarly inappropriate was a proposed inclusionary development that was comprised not of traditional, multi-family units, but rather, only of age-restricted, single family, detached homes. Even more problematic was the Township's insistence on a thirty-three percent (33%) set-aside for low- and moderate-income units, instead of the 15–20% set-asides traditionally sanctioned by COAH and the courts.

Equally problematic was a proposed inclusionary development that was limited to a gross density of 2.8 units per acre. Given the internal subsidies needed to justify the economics of such developments, and the minimum densities typically demanded and approved by COAH and the courts (six or more units/acre), this proposal too, was ill-conceived.

In light of these and other deficiencies and the Township's steadfast refusal to remedy and/or remove the plan's obvious

---

[2] Even after I denied the Township's request for a waiver of the 25% cap, the Township insisted on violating the 25% cap on age-restricted units. *See In re Adoption of N.J.A.C. 5:94 & 5:95,* 390 *N.J.Super.* 1, 75, 914 A.2d 348 (App. Div. 2007) (declaring the "expansion of the age-restricted cap from twenty-five percent to fifty percent in *N.J.A.C.* 5:94–4.19" to be invalid, and that "the prior age-restricted cap of twenty-five percent should remain in place pending further agency action").

flaws, I was constrained to conclude that South Brunswick was not proceeding in good faith, and was "determined to be non-compliant." *See Mount Laurel IV, supra,* 221 *N.J.* at 72–73, 110 *A.*3d 31. Despite a span of seven months and several extensions of its immunity, South Brunswick's progress had been "minuscule" at best. Its insistence in relying upon mechanisms that were legally improper was entirely unacceptable.

Based on those findings, I revoked South Brunswick's immunity from exclusionary zoning/builders remedy actions. *See Mount Laurel IV, supra,* 221 *N.J.* at 26, 33, 35–36, 110 *A.*3d 31 (while the goal is "to secure, whenever possible, prompt voluntary compliance," if that goal cannot be accomplished with good faith effort and reasonable speed, and the town "abuses the process" then "immunity, once granted, should be withdrawn," and exclusionary zoning actions seeking a builder's remedy, permitted to proceed).

However, even after I revoked its immunity, I afforded the Township one final opportunity to voluntarily comply by "staying" the effective date of my order until April 15, 2016, giving it an additional two months to demonstrate its good faith, which it could do by: (1) revising its plan to comply with valid COAH regulations; (2) reducing its reliance on 100% affordable tax credit projects; and (3) including in its plan, legitimate, multi-family inclusionary developments with traditionally acceptable densities and set-asides.

In an effort to further facilitate the Township's compliance, I extended, sua sponte, the "stay" of my revocation order until May 2, 2016, the scheduled trial date. Regrettably, that accommodation proved unavailing and the stay expired.

## III. DEVISING A CONSTITUTIONALLY COMPLIANT METHODOLOGY

The trial was bifurcated into two discrete phases: (1) a determination of the proper methodology to be used in calculating South Brunswick's fair share obligation, and in conjunction there-

with, a calculation of the Township's actual fair share number; and (2) how best to achieve constitutional compliance.

The trial of the first phase spanned eight days, during which the parties were directed to offer proofs regarding a methodology that would be both faithful to and followed—to the extent practical—those methodologies and guiding principles previously adopted by COAH, as per the Supreme Court's mandate in *Mount Laurel IV*, *supra*, 221 *N.J.* at 30–33, 110 *A.3d* 31. Where data sources previously relied on by COAH were no longer available, the parties were instructed to use "reliable" substitute data,[3] while making as few "assumptions" as possible, in order to achieve a reasonable methodology that would best achieve actual construction of low- and moderate-income housing units.

Based on my evaluation of the testimony of the competing experts, I adopt a fair share methodology that I believe is both constitutional and faithful to the Supreme Court's unequivocal mandate. Consistent with that methodology, South Brunswick's pre-credited and uncapped fair share of the region's "prospective" need obligation is 1,533 units.[4]

---

[3] In this regard, Judge Serpentelli's opinion in *AMG Realty Co. v. Twp. of Warren*, *supra*, 207 *N.J.Super.* at 453, 504 *A.2d* 692 is instructive:

> The pivotal question is not whether the numbers are too high or low, but whether the methodology that produces the numbers is reasonable. Any reasonable methodology must have as its keystone three ingredients: reliable data, as few assumptions as possible, and an internal system of checks and balances. Reliable data refers to the best source available for the information needed and the rejection of data which is suspect. The need to make as few assumptions as possible refers to the desirability of avoiding subjectivity and avoiding any data which requires excessive mathematical extrapolation. An internal system of checks and balances refers to the effort to include all important concepts while not allowing any concept to have a disproportionate impact.

*See also Toll Bros. v. Twp. of W. Windsor*, 173 *N.J.* 502, 577, 803 *A.2d* 53 (2002).

[4] This number represents a "gross" figure that will likely be adjusted downward based on a number of COAH-approved regulations and devices, including: (1) the Township's entitlement to credits (including bonus credits) which shall be addressed in the manner authorized by COAH and upheld by the Supreme Court in *Mount Laurel IV, supra,* 221 *N.J.* at 31–32, 110 *A.3d* 31 and by the Appellate

## A. Experts

The formulation of an acceptable methodology for calculating a municipality's affordable housing obligation is an exercise that requires me to draw upon the expertise of various experts who, in this case, offered a wide range of backgrounds and experiences in relevant areas including: planning, zoning, affordable housing, COAH regulations, and economic modeling, as well as population and household projections. Those experts offered detailed opinions on the appropriate components and extrapolations needed to craft a methodology which adheres, as closely as possible, to the Supreme Court's directive in *Mount Laurel IV*. Their backgrounds and qualifications are briefly summarized below.

### 1. Dr. Peter Angelides—Offered by the Township of South Brunswick

A University of Pennsylvania graduate in urban studies, with a Master's degree in city planning, Angelides earned his Ph.D. in economics from the University of Minnesota. His background included significant experience in economic modeling and providing economic, financial, and strategic advice to both private and public entities on economic development, transportation, real estate, and public policy.

### 2. Dr. David Kinsey—Offered by FSHC

A Princeton University graduate with a Master's degree in public affairs and urban planning, a Ph.D. in public and international affairs, and a licensed professional planner in New Jersey, Kinsey's work experience included being the director of the Division of Coastal Resources at the New Jersey Department of Environmental Protection ("DEP"), where he was tasked with addressing affordable housing issues as part of his oversight

Division in *In re Application of Township of Jackson*, 350 *N.J.Super.* 369, 374–77, 795 *A.*2d 318 (App. Div. 2002); and (2) the applicability of regulatory "caps," (a) limiting a municipality's fair share to 1000 units for any given ten-year compliance cycle, *see N.J.S.A.* 52:27D–307(e); and/or (b) limiting a municipality's fair share obligation to no more than 20% of the total housing stock of the municipality, *see N.J.A.C.* 5:93–2.16.

responsibilities under CAFRA (the Coastal Area Facility Review Act). His work in the private sector as a planning consultant specifically included formulating methodologies and compliance mechanisms, drafting fair share plans for municipalities, and advising private developers and public interest entities on affordable housing issues.

### 3. Art Bernard—Offered by Richardson Fresh Ponds and Princeton Orchard Associates

Holder of a Master's degree in City and Regional Planning from Rutgers University, and a licensed professional planner in New Jersey, Bernard's work experience included a stint as deputy director, and later as executive director of COAH, where he participated in the development, drafting, and implementation of the First and Second Round Rules. After leaving COAH (in 1994), Bernard served as a planning and affordable housing consultant to twenty-four municipalities, served as a court-appointed special master on five occasions, and has consulted for private developer clients as well.

### 4. Daniel McCue—Offered by FSHC

McCue earned his degree from Williams College (mathematics), and later obtained a Master's degree in urban planning with a concentration in housing from the Harvard University Graduate School of Design. He currently serves as a senior research associate at the Harvard University Joint Center for Housing Studies. He is also the publisher and primary author of the "State of the Nation's Housing" report, a nationally recognized publication that includes demographic analyses of housing, headship rates, and household projections.

## B. The Component Parts of a Constitutionally Acceptable Fair Share Methodology

The Township's affordable housing obligation is comprised of three components: (1) unmet need, if any, from the prior round;[5]

---

[5] Based on the proofs and documentation submitted, I am satisfied that the Township fully satisfied its prior round obligation of 841 units, and as such, no further discussion is required.

(2) present need; and (3) Third Round prospective need from July 1, 2015, to June 30, 2025. Each component, along with its corresponding steps, will be separately addressed.

## 1. Present Need

■ The FHA does not explicitly define present need. However, COAH has consistently defined it as the existing number of deficient housing units within a municipality. *See N.J.A.C.* 5:92–1.3 (First Round); *N.J.A.C.* 5:93–1.3 (Second Round). To calculate present need, the first step is to identify the surrogate measures of deficiencies. In its prior round rules, COAH used seven surrogates from the U.S. Census Bureau to measure deficient housing. However, since the Census Bureau no longer publishes that data set, other surrogates were required to be used. In accordance with the Third Round Rules, both Kinsey and Angelides utilized the following three surrogates: housing that (1) is over fifty years old and overcrowded; (2) lacks complete plumbing; or (3) lacks a complete kitchen.

While Kinsey adhered to COAH's prior round methodologies and used its published income limits, Angelides utilized income limits that were different from the Uniform Housing Affordability Controls ("UHAC"), *see N.J.A.C.* 5:80–26.1 to –26.26, as adopted by the New Jersey Housing and Mortgage Finance Agency ("HMFA").

Because Angelides' approach is inconsistent with both COAH and UHAC regulations, I have concluded that Kinsey's approach, which yielded a present need of 109 units, was more appropriate.

## 2. Prospective Need [6]

■ There are three main components in determining prospective need, each of which requires multiple steps: (1) the calcula-

---

[6] This section, and the discussion that follows, addresses in an abridged fashion, my review and credibility determinations as to Kinsey, Angelides, Bernard, and McCue. While obviously important to the merits of the case, those determinations are neither novel nor unique, but rather simply reflect that which trial judges do as a matter of routine—applying facts to law. Accordingly, in the

tion of a regional prospective need; (2) an allocation of municipal prospective need; and (3) an adjustment for secondary sources of demand and supply. Each of the three components, as well as a multitude of corresponding steps, respectively, are addressed, below.

### a. Calculation of Regional Prospective Need

The calculation of regional prospective need is multi-step process, the particulars of which are addressed below.

#### i. Identify the Housing Region

In both the First and Second Rounds, Middlesex County was located in Region 3, which consists of Hunterdon, Somerset, and Middlesex counties. *See N.J.S.A.* 52:27D–304(b). Finding no reason to deviate from the COAH designation, I am satisfied that South Brunswick is properly located in Region 3.

#### ii. Determine the Population Calculation and Projection Periods

Prospective need consists of the affordable housing need that will be generated from 2015 until 2025.

#### iii. Determine Regional Population 2015 and Project Regional Population 2025

While the experts agree that the determination of prospective need is dependent upon projecting population growth by county and age cohort, they disagree about which data set, or combination of data sets, should be used to do so.

Unfortunately, strict adherence to either the First or Second Round methodologies is impossible because the data sources used by COAH are no longer available. My task, however, is to fashion a reasonable methodology that contains "as few assumptions as possible." *AMG Realty Co. v. Twp. of Warren, supra,* 207 *N.J.* at 453, 504 *A.2d* 692 (Law. Div. 1984). Accordingly, because the Economic Demographics model relied upon by the intervenors'

---

interest of brevity, significant portions of the actual trial testimony, but not my findings and conclusions, have been omitted from this abridged version.

experts is the only model that projects household growth the same way that COAH did—e.g., by county and age cohort—and requires the fewest assumptions in projecting households from 2015 to 2025, I accept the use of that data source.

### iv. Identify and Remove "Group Quarters" Residents from Calculations of the Total Population

Because neither the experts nor COAH included persons living in group quarters, I did not include such a calculation either.

### v. Calculate and Project "Headship Rates"

"Headship rates" reflect the percentage of population growth that will result in new households being formed among each age group, by measuring the probability that a person in a specific age cohort will form a household. In its Second Round Rules, COAH assumed that headship rates would decline, so it estimated headship rates "by age group and county in New Jersey in 1990 and extended into the future at one-half rate the rate of change observed from 1980 and 1990." 26 *N.J.R.* 2347 (June 6, 1994).

Angelides calculated headship rates differently from the way COAH did. Using a different data set, he projected a decrease in household formations and a decrease in prospective need.

While neither expert could precisely replicate COAH's prior round methodologies, because Kinsey's approach relies on fewer assumptions and is more consistent with prior round methodologies, I accept his approach.

### vi. Establishing Low- and Moderate–Income Limits

Because the establishment of low- and moderate-income limits is the cornerstone for any fair share calculation, the next step is to estimate the proportion of those projected households that actually qualify as low- and moderate-income households.

The FHA defines low- and moderate-income housing as follows:
"Low income housing" means housing affordable according to federal Department of Housing and Urban Development or other recognized standards for home ownership and rental costs and occupied or reserved for occupancy by households with a gross household income equal to 50% or less of the median

gross household income for households of the same size within the housing region in which the housing is located.

[*N.J.S.A.* 52:27D–304(c).]

"Moderate income housing" means housing affordable according to federal Department of Housing and Urban Development or other recognized standards for home ownership and rental costs and occupied or reserved for occupancy by households with a gross household income equal to more than 50% but less than 80% of the median gross household income for households of the same size within the housing region in which the housing is located.

[*N.J.S.A.* 52:27D–304(d).]

While Kinsey utilized COAH's regional income limits to perform his calculations, Angelides devised a different, unique approach and calculated different income limits for low and moderate income households, which would, if accepted: (1) drastically reduce the statewide need for affordable housing by thousands of units; and (2) create "a huge disconnect" between those households he included as being "in need" of affordable housing and those that actually "qualified" for it.

Because Kinsey's approach adhered to COAH's income limits, I have included it as integral to a constitutional fair share methodology.

vii. Pool and Reallocate Calculated Changes in Regional
Distribution of Low- and Moderate–Income
Households Below Age 65

Although COAH's Second Round methodology included a provision for reallocating prospective need, neither expert believed that such a reallocation was appropriate for Region 3.

viii. The Final Calculation of Regional
Prospective Need (2015–2025)

This final step is to allocate the 2015–2025 regional prospective need to each municipality in the region, and thereafter to adjust it to take into account secondary sources of demand and supply. Because I find Kinsey faithfully followed COAH's protocols and processes, while Angelides did not, I accept Kinsey's calculations.

b. Allocating Municipal Prospective Need

■ Once regional prospective need has been calculated, the following steps must be taken to allocate that need to a particular municipality:

 (i) Exempt qualifying urban aid municipalities from the housing need allocations;

 (ii) Calculate the equalized non-residential valuation (ratables) factors;

 (iii) Calculate the undeveloped land factor;

 (iv) Calculate the differences in household income factor;

 (v) Calculate the average allocation factor to distribute low and moderate income housing need by municipality; and

 (vi) Calculate gross prospective need.

### i. Exempt Qualifying Urban Aid Municipalities from the Housing Need Obligation

In both its First and Second Round methodologies, COAH declined to allocate any prospective need obligation to the designated Urban Aid Municipalities. Accordingly, no such reallocation will be made.

### ii. Calculate the Equalized Non–Residential Valuation (Ratables) Factors

In its First Round methodology, COAH utilized a number of allocation factors, including: (1) the current covered employment, and (2) the change in that covered employment. However, the use of those factors generated an anomaly, identified by COAH as the "zip code problem," that occurs when a business' place of employment (the building) is physically located in one municipality, but the business' mailing address and/or zip code correlates to a different municipality. As a consequence, the municipality where the building is located might not receive credit for jobs (and job growth), which in turn, would skew the allocation factor. Consequently, COAH altered its methodology in the Second Round, and relied instead on non-residential ratables as a "surrogate" for employment. This approach was embraced by Kinsey.

Angelides, on the other hand, projected that South Brunswick's employment growth over the next ten-year compliance cycle would

be "zero," which, if accepted would of necessity, lower South Brunswick's prospective need numbers. Given the Township's reliance on non-residential growth to finance its Affordable Housing Trust fund expenditures, the disconnect between the Township's fair share plan and its own expert's opinion is glaring.

Accordingly, I accept Kinsey's approach as is his conclusion that South Brunswick's share of non-residential ratable growth is .086164517 (or, 8.6164517%).

### iii. Calculate the Undeveloped Land Factor

The next step is to determine whether a municipality has the physical capacity to absorb and provide for affordable housing, thus requiring an analysis of the potentially developable land in a municipality.

In his calculation of South Brunswick's absorption capability, Angelides excluded from the land inventory, any parcel that was: (1) developed, but under-utilized; (2) in a redevelopment plan; (3) abandoned; (4) in foreclosure; or (5) developable, but environmentally sensitive. This approach significantly deviated from COAH's accepted Rules, inappropriately skewed the results, and lowered South Brunswick's fair share numbers.

On the other hand, Kinsey properly adhered to COAH's Second Round methodology, and, using photographic imagery, concluded that approximately 1,000,000 acres of developable land remained statewide. That resulted in an allocation factor of .101856321 (or, 10.1856321%), which is accepted.

### iv. Calculate the Differences in Household Income Factor

The next step is to evaluate the Township's fiscal capacity to absorb affordable housing, which is achieved by calculating the "household income difference" factor.

In addressing this issue, both Kinsey and Angelides essentially utilized COAH's Second Round methodology and, predictably, reached similar results. However, Angelides relied on the less up-to-date 2009–2013 ACS data, without offering any compelling reason to do so. Since Kinsey used the most current data, his

income difference factor of .036042548 (or, 3.6042548%) is accepted.

v. Calculate the Average Allocation Factor to Distribute Low- and Moderate–Income Housing Need by Municipality

Once the three allocation factors have been determined, both experts agree that the next step is to calculate the "average" allocation factor for each municipality.

Because I have accepted each of Kinsey's allocation factors, I find that South Brunswick's "averaged" allocation factor is .074687795.[7]

vi. Calculate Gross Prospective Need

The final step is to calculate the Township's gross prospective need, which requires multiplying the regional prospective need number by the average allocation factor.

Using Kinsey's calculation of regional prospective need, and his average allocation factor, I am satisfied that South Brunswick's allocated prospective need is 7.47% of the projected 20,396 units, which, without adjusting for secondary sources, is 1,523 units.[8]

c. Adjusting for Secondary Source of Demand and Supply

To properly adjust for secondary sources of demand and supply, all parties agree that the following seven steps must be completed:

 (i) Estimate for 2015 and project for 2025 demolitions affecting low- and moderate-income households;

 (ii) Estimate for 2015 and project for 2025 residential conversions affecting low and moderate income households;

 (iii) Estimate and project filtering affecting low and moderate income households;

 (iv) Calculate prospective need by municipality;

---

[7] .086164517 (nonresidential valuation factor) + .101856321 (undeveloped land factor) + .036042548 (household income difference factor) = .22406337 / 3 = .074687795.

[8] 20,396 (regional prospective need) x .074687795 (average allocation factor = 1,523.33216, which is then rounded down to 1,523 units.

(v) Calculate the 20–percent cap and, if applicable, reduce prospective need;

(vi) Calculate prospective need obligations (net) by municipality; and

(vii) Calculate the 1000–unit cap and, if applicable, reduce the prospective need obligation.

Each of these steps is addressed below.

### i. Estimate for 2015 and Project for 2025 Demolitions Affecting Low- and Moderate–Income Households

In its prior round methodologies, COAH accounted for affordable housing units that were demolished (and therefore no longer available to low- and moderate-income households) by using the number of demolition permits issued, to concomitantly increase a municipality's affordable housing obligation for each demolished unit.

Using the actual number of demolition permits reported by the DCA between 1999 and 2015, Kinsey established an annualized "trend line," to project the probable amount of demolitions that would take place between 2015 and 2025. He then applied that amount to the percentage of demolitions that he estimated would impact low- and moderate-income households in the county, which yielded the number of units no longer available to low- and moderate-income persons. Angelides chose not to follow COAH's prior round methodologies in this regard, but offered no discernable basis for refusing to do so. Accordingly, I have embraced Kinsey's approach.

### ii. Estimate for 2015 and Projection for 2025 Residential Conversions Affecting Low- and Moderate–Income Households

Conversions are another secondary source affecting the supply side of housing units. Conversions occur when a residential property is altered or "converted" into multiple housing units, which, unlike demolitions, lower a municipality's affordable housing obligation.

While both experts generally followed the same methodology in calculating conversions, they used different data sources. Kinsey

used building permits, as did COAH. Angelides did not, and instead used "certificates of occupancy," which lowered the estimated statewide need for affordable housing by approximately 20,000 units. Because Kinsey's approach is consistent with COAH's rules, I accept it.

### iii. Estimate and Project Filtering Affecting Low- and Moderate–Income Households

The final secondary source of demand and supply is "filtering." Downward filtering (which reduces prospective need) occurs when a middle- or upper-income household moves out of a housing unit that is affordable to a low- and moderate-income household. Conversely, upward filtering (which increases prospective need) occurs when the cost of a housing unit that was once affordable to a low- or moderate-income household, rises above that which is affordable to a low- or moderate-income household.

In 2007, the Appellate Division invalidated COAH's Third Round filtering model. *See In re Adoption of N.J.A.C. 5:94 & 5:95*, 390 *N.J.Super.* 1, 45–46, 914 *A.2d* 348 (App. Div. 2007). While the court did not foreclose the use of filtering as a secondary source, it cautioned that a methodology for filtering "must be based on the most recent and reliable data available." *Id.* at 46, 914 *A.2d* 348.

While Angelides initially estimated that over 37,000 units would "filter down" to low- and moderate-income persons between 2015 and 2025 in the State, he ultimately conceded that his exclusion of: (1) down payments; (2) principal; and (3) mortgage interest from his estimate of "housing costs" was improper—a flaw that resulted in his claiming that a $500,000 home at the Jersey Shore qualified as an "affordable unit.[9] This was especially revealing given COAH's upward ceiling of $196,000 for a moderate-income household in Region 3.

---

[9] Indeed, when these three components were factored back into his methodology, the statewide need for affordable housing increased.

While both Angelides and Kinsey included "filtering" as a factor to be considered in formulating an appropriate fair share methodology, Bernard expressed doubts about whether it was appropriate at all. After careful consideration, I am persuaded by Bernard's testimony that neither Kinsey nor Angelides satisfactorily addressed the deficiencies identified by the Appellate Division in *In Re Adoption of N.J.A.C. 5:94 and 5:95*, *supra*, 390 *N.J.Super.* at 45–46, 914 *A.*2d 348. Given the Supreme Court's admonition to avoid using "disapproved" techniques, I have excluded "filtering" from my fair share methodology.

### iv. Calculate Prospective Need by Municipality

The next step is to adjust the Township's gross prospective need of 1,523 units, in light of the secondary sources of supply and demand. While I have excluded the concept of "filtering," both demolitions and conversions remain viable secondary sources, which will ultimately affect South Brunswick's fair share obligation.

According to Kinsey's methodology, South Brunswick's fair share obligation increased by 30 units because of "demolitions" between 2015 and 2025, but it decreased by 20 units based on "conversions." Accordingly, after applying the net increase of 10 units, South Brunswick's fair share obligation is 1,533, a number that will be further adjusted based on a number of COAH approved regulations and devices.[10] Finally, the last three steps of this component are:

(a) calculate the 20% cap and, if applicable;

(b) calculate the Municipality's prospective need obligations; and

(c) calculate the 1,000–unit cap and, if applicable, reduce the prospective need obligation accordingly.

All necessary adjustments will be addressed during the compliance phase of the trial.

---

[10] The precise calculations performed to compute South Brunswick's underlined_unadjusted fair share number of 1533, are detailed, *infra* in the attached Appendix.

## C. Summary of Witness Credibility [11]

McCue answered all questions directly and candidly, was knowledgeable, and had no apparent bias or motive to "shade" his testimony. His testimony was consistent with common sense, supported by reliable data, and generally believable in all respects.

Likewise, Bernard's testimony was also highly credible and persuasive. His unique background enabled him to offer a unique perspective, unrivaled by any other witness, about the substantive issues confronting the court. His presence at COAH during the promulgation of that Agency's First and Second Round Rules imbued him with knowledge of, and invaluable insights into, COAH's policy objectives and rationales.

I also find the testimony of Kinsey to be credible and forthright as well, reflecting his deep, possibly unparalleled understanding of the *Mount Laurel* doctrine. I find his testimony persuasive and gave it great weight.

In stark contrast, Angelides' testimony was evasive, far less credible on matters of importance, and frequently contrary to established COAH rules and judicial precedent. In point of fact, Angelides deviated from COAH's prior round methodologies on twenty-six occasions, (each of which lowered South Brunswick's obligation) often when comparable data was readily available and replication was possible. This repeated refusal to adhere to COAH's established methodologies, *see Mount Laurel IV, supra,* 221 *N.J.* at 30, 110 *A.*3d 31, and his inability to demonstrate computations related to housing need and municipal obligations "based on those methodologies," *ibid,* resulted in my rejection of his testimony.

---

[11] While witness credibility is obviously an important factor in rendering any decision, such assessments are not particularly novel from a precedential point of view. Therefore, in the interests of brevity, I have eliminated much of that discussion in this abridged version of my original opinion.

## IV. REMEDIAL PROCEEDINGS—PHASE II

The next phase of South Brunswick's bifurcated compliance trial would ordinarily require "an individualized assessment" of the Township's housing element and fair share plan, based upon the Township's calculated fair share of the present and prospective regional need for affordable housing. *See Mount Laurel IV, supra,* 221 *N.J.* at 28–29, 110 *A.*3d 31. Here, however, because of the Township's systematic "abuses" of the declaratory judgment process, and the revocation of its immunity, the Township stands in a far less favorable position than it would have had it proceeded "with good faith" and with "reasonable speed." *See id.* at 26, 33, 110 *A.*3d 31. Instead of being given an opportunity to "supplement" and remedy perceived deficiencies in its housing element and fair share plan, while, at the same time, retaining its "immunity" from builder remedy lawsuits, a more intrusive, less deferential approach is warranted.

Unfortunately, the path chosen by the Township: (1) measured by its insistence on including in its plans mechanisms that were inconsistent with COAH regulations and judicial precedent; and (2) marked by its steadfast refusal to make the necessary modifications, caused me to conclude that South Brunswick was "determined to be constitutionally non-compliant," resulting in a concomitant loss of its immunity, *id.* at 33, 110 *A.*3d 31, and giving rise to the last of the novel issues to be resolved.

 After South Brunswick's immunity was revoked, several actions were filed against it, seeking site specific relief—builders' remedies—which collectively sought to have various parcels rezoned to permit affordable housing. Under *Mount Laurel IV,* these actions are authorized only where the declaratory judgment review process was "abused," became "unreasonably protracted," *id.* at 26, 110 *A.*3d 31, or where the Township's proposed manner of compliance was "constitutionally wanting," *id.* at 29, 110 *A.*3d 31. They are not dependent upon, and are substantially different from, the "reward-based" approach crafted by the Supreme Court in *Mount Laurel II, supra,* 92 *N.J.* at 158, 278–80, 456 *A.*2d 390

(builders' remedies "should be granted" where a builder/plaintiff "vindicates the constitutional obligation"). Instead, the framework established in *Mount Laurel IV* fundamentally alters that approach, rendering obsolete the "first to file" priority scheme first articulated in *J.W. Field Co., Inc. v. Franklin Twp.*, *supra*, 204 *N.J.Super.* at 445, 499 *A.2d* 251.[12] This is especially so because being a "successful plaintiff", previously a prerequisite to a builder's remedy, is no longer a consideration. *Compare, Mount Laurel IV*, *supra*, 221 *N.J.* at 26–27, 29, 110 *A.3d* 31.

▪ As such, the multiple builders' remedies awarded in this case will be designated and prioritized through an interactive process, guided primarily by equitable considerations, which shall include, at a minimum: (1) an assessment of whether any project was clearly more likely to result in actual construction than other projects; (2) the availability of infrastructure; (3) the project's proximity to goods and services; (4) its regional accessibility; and (5) the property's environmental suitability and compatibility with neighboring land uses. *See J.W. Field Co., Inc.*, *supra*, 204 *N.J.Super.* at 460–463, 499 *A.2d* 251; *see also Mount Laurel II*, *supra*, 92 *N.J.* at 211, 456 *A.2d* 390 (the obligation to encourage low-income housing, will depend upon "natural long-range land use planning" rather than upon "sheer economic forces"). As confirmed by the Supreme Court, the "Constitution of the State of New Jersey does not require bad planning." *Id.* at 238, 456 *A.2d* 390.

## V. CONCLUSION

In enacting the FHA, the Legislature "clearly signaled," and the Supreme Court recognized, that an administrative remedy

---

[12] While the "date of filing" priority system adopted in *J.W. Field Co., Inc.*, *supra*, 204 *N.J.Super.* at 460, 462, 499 *A.2d* 251, has never been specifically embraced by any appellate authority, it has, for all intents and purposes, become embedded and generally followed in *Mount Laurel* jurisprudence for more than thirty years. It seems reasonable to conclude that it remains a viable protocol for determining priorities among multiple plaintiffs in litigation against towns that were neither "certified" nor enjoyed "participating status" before COAH.

that resulted in "voluntary municipal compliance" with its affordable housing obligation, was "preferred" to litigation culminating in a "compelled rezoning." *Mount Laurel IV, supra,* 221 *N.J.* at 34, 110 *A.*3d 31. Because of COAH's inability to function, the Supreme Court dissolved the FHA's "exhaustion-of-administrative-remedies requirement" leaving the courts to "resume" their role as "the forum of first instance," *id.* at 20, 110 *A.*3d 31, in adjudicating a municipality's constitutional compliance. *Id.* at 29, 110 *A.*3d 31.

The Supreme Court undoubtedly envisioned that "certified" and "participating" towns would likely subject themselves, as South Brunswick did in this case, to judicial review via the filing of a declaratory judgment action, taking advantage of the temporary immunity from the threat of multiple builder remedy lawsuits. *Id.* at 23–24, 110 *A.*3d 31.

The Court also recognized, however, that some municipalities might not embrace, in full, their affordable housing obligation, but instead might pursue a path of resistance, resulting in a loss of immunity. Judge Serpentelli's admonition in *J.W. Field Co., Inc., supra,* 204 *N.J.Super.* at 468, 499 *A.*2d 251, bears repeating here: "[i]f a municipality chooses not to voluntarily comply, it brings upon itself the potential that multiple builders will force it to comply. The choice is the municipality's."

Regrettably, because South Brunswick failed to heed this warning, the elements of its affordable housing plan will not be those selected by its elected and appointed representatives, but instead, will be those designed and implemented by third parties, the Special Master, and the Court.

Intervenor FSHC shall submit an appropriate form of order under the five-day rule, incorporating this opinion by reference, and which sets South Brunswick's pre-credited and unadjusted fair share of the region's prospective need at 1,533 units.

Costs to Defendant–Intervenors.

APPENDIX

**Third Round Prospective Need, 2015-2025 Calculations Summary, Township of South Brunswick, Middlesex County, NJ, July 2016**

| PROSPECTIVE NEED, 2015-2025 (affordable housing units) | | |
|---|---|---|
| Step | Sources and Calculations | Result |
| PHASE ONE: CALCULATE REGIONAL PROSPECTIVE NEED | | |
| 1 | Identify the 'housing region" | Report, pp. 23-24 | COAH Housing Region 3 West Central: Hunterdon, Somerset, and Middlesex Counties |
| 2 | Determine the population projection period | Report, p. 25 | 2015-2025 |
| 3 | Determine the regional population 2015 and project regional population 2025 (persons) | Model: Tabs 1c., 1c1., 1e., & 1ef. | 1,378,500 |
| 4 | Identify and remove 2014 "group quarters" population from total population | Model: Tab 1h. | |
| 5 | Calculate 2000 and 2014 headship rates and project 2015 and 2025 headship rates | Model: Tab 1g. | |
| 6 | [Estimate 1999 LMI HH: Removed from April 2016 Model at request of the Court] | | |
| 7 | Calculate 2015 low- and moderate-income households | Model: Tabs 1b. & 1f. | 184,462 |
| 8 | Project 2025 low- and moderate-income households | Model: Tab 1b1. | 204,857 |
| 9 | Calculate and project the regional increase in low and moderate income households, 2015-2025 | Step 8 - Step 7 = 204,857 - 184,462 = 20,396 | 20,396 |
| 10 | Pool and reallocate projected regional growth in low and moderate income households below age 65 | Not applicable | Not applicable |
| 11 | Determine regional prospective need (units) | Step 9 | 20,396 |
| PHASE TWO: ALLOCATE MUNICIPAL PROSPECTIVE NEED | | |
| 12 | Exempt Qualifying Urban (Municipal) Aid municipalities from housing need allocations | Not applicable | Not applicable |

| 13 | Calculate the equalized nonresidential valuation (ratables) factor | Model: Tab 3, A275:T275 | 0.086164517 |
|---|---|---|---|
| 14 | Calculate the undeveloped land factor | Model: Tab 4, A275:H275 | 0.101856321 |
| 15 | Calculate the differences in household income factor | Model: Tab 5, B275:P275 | 0.036042548 |
| 16 | Calculate average allocation factor to distribute regional low and moderate income housing need by municipality | (Step 13 + Step 14 + Step 15)/3 = (0.086164517 + 0.101856321 +0.036042548)/3 = 0.074687795 | 0.074687795 |
| 17 | Calculate gross municipal prospective need municipality (units) | Step 11 x Step 16 = 20,396 x 0.074687795 = 1,523 | 1,523 |

PHASE THREE: ADJUST FOR SECONDARY SOURCES OF DEMAND AND SUPPLY

| 18 | [Filtering: Removed from April 2016 Model at the request of the Court] | | |
|---|---|---|---|
| 19 | Estimate residential conversions affecting low- and moderate-income households (units) | Model: Tab 8, A275:I275 | 20 |
| 20 | Estimate demolitions affecting low- and moderate-income households (units) | Model: Tab 8, A321:AD321 | 30 |
| 21 | Calculate prospective need by municipality (units) | Step 17 - Step 19 + Step 20 = 1,523 - 20 + 30 = 1,533 | 1,533 |

PHASE FOUR: ADJUST FOR CAPS

| 22 | Calculate the 20% cap and, if applicable, reduce prospective need (units) | Model: Tab 2015-25 Mid C. Post Cap, A24:I24 | Not applicable |
|---|---|---|---|
| 23 | Calculate the prospective need obligation (net) by municipality (units) | Step 21 | 1,533 |
| 24 | Calculate the 1,000 unit cap and, if applicable, reduce the net prospective need obligation | To be determined after verification of credits by the Court | To be determined after verification of credits by the Court |

Notes:

A For a description and explanation of each of the steps and data sources used to reach the determinations in this table, see "NEW JERSEY FAIR SHARE HOUSING OBLIGATIONS FOR 1999-2025 (THIRD ROUND) UNDER MOUNT LAUREL IV FOR MIDDLESEX COUNTY," dated April 21, 2016, prepared by David N Kinsey, PhD, FAICP, PP, for and in collaboration with Fair Share Housing Center ("Report").

B For the data and calculations that are the source of the determinations in this table, see the Excel workbook with linked worksheets that provide the data, data sources, and calculations used to compute 2015 Present Need, 1987-1999 Prior Round obligations, and 2015-2025 net Prospective Need allocations using the Prior Round methodology , FSHC R3 Model - Middlesex County - Without Gap Period and Filtering, submitted July 19, 2016 ("Model").

Prepared by David N Kinsey, PhD, FAICP, PP, Kinsey & Hand, Princeton, NJ, July 20, 2016